DENISE CORNIER, Respondent, v JAMES SPAGNA et al., Appellants, et al., Defendants.

First Department, April 19, 1984

142

APPEARANCES OF COUNSEL

*Andrew B. Lane* of counsel (*George van Setter* with him on the brief; *Martin, Clearwater & Bell,* attorneys), for Bell Helmets, Inc., appellant.

*Richard E. Rubin* of counsel (*Howard Davis,* attorney), for James Spagna, appellant.

*Leonard L. Finz* of counsel (*William D. Fireman* with him on the brief; *Julien, Schlesinger & Finz, P.C.,* attorneys), for respondent.

OPINION OF THE COURT

MURPHY, P. J.

This action arises from a collision that occurred on August 25, 1977 on Schley Avenue in Bronx County. Traffic was permitted to flow on Schley Avenue in a northerly and southerly direction. Plaintiff Denise Cornier was a passenger on a motorcycle driven by defendant James Spagna in a northerly direction. The motorcycle came into contact with an automobile driven by defendant Mack Davis in a southerly direction. Davis had been double-parked immediately prior to the occurrence. He had driven his vehicle to the left in order to enter a traffic lane on Schley Avenue. As the Davis vehicle was entering the traffic lane, the collision occurred.

Conflicting evidence was presented at trial as to the facts and circumstances surrounding the collision. Of particular importance were questions relating to whether (i) the impact had taken place on Spagna's side of Schley Avenue and (ii) the speed of the motorcycle. As a result of the collision, plaintiff Cornier landed approximately 72 feet

from the point of impact. A further issue of importance was presented as to whether the plaintiff flew through the air after the impact or whether she rolled to that position after being thrown from the motorcycle. Although plaintiff was wearing a Super Magnum helmet manufactured by defendant Bell Helmet Corp., she sustained brain damage together with other injuries in the occurrence. The helmet cracked during this incident.

Plaintiff prosecuted this case upon four theories, viz.: (i) negligence, (ii) strict products liability, (iii) breach of express warranty and (iv) breach of implied warranty. In order to establish her case against defendant Bell, plaintiff introduced proof to show that Bell had violated minimum safety standards promulgated by the Department of Transportation (D.O.T.) (Traffic and Motor Vehicle Safety Act, US Code, tit 15, § 1381 *et seq.;* Federal Motor Vehicle Safety Standard No. 218). The D.O.T. requested the Southwest Research Institute (SWRI) to perform compliance tests on the Super Magnum model during the 1970's. This model passed all tests until October and November of 1976 when four out of six test helmets had "dwell time" readings in excess of the safety standards. Suffice it to say that plaintiff's expert, Dr. Igor Paul, testified as to the correlation between "dwell time" and the chance of brain damage.

Plaintiff's case was also buttressed to a limited extent by the testimony of Bell's Director of Research and Development, George Sundahl. The testimony of Sundahl suggested at one point that the helmet's liner did not properly respond under the severe impact in this case.

Bell, on the other hand, adduced evidence tending to indicate that the Super Magnum model met the minimum safety standards of D.O.T. It was Bell's contention that testing protocol was not followed in the testing by SWRI of the first four helmets. It was Bell's further contention that SWRI's equipment was not properly calibrated during the testing of the last two helmets. Another of Bell's experts, Dean Leroy Fisher, testified that the Super Magnum model had provided the plaintiff with more protection than any other model then on the market.

The D.O.T. never took any formal action nor did it make any informal determinations with regard to the SWRI test

reports of noncompliance. Eventually, during the trial of this action, the D.O.T. terminated its investigation in this matter. The parties did not learn of this termination until after the trial had ended and a verdict rendered for the plaintiff.

The jury returned a verdict in plaintiff's favor on all theories except breach of express warranty. Plaintiff was awarded (i) $450,000 for pain, suffering and disability, (ii) $1,750,000 for future medical costs, (iii) $450,000 for custodial care, and (iv) $350,000 for diminution of total earnings. The apportionment was 15% to Spagna, 10% to Davis, and 75% to Bell. Spagna and Bell now appeal.

Bell raises many issues in its brief. Many of these issues do not receive separate point headings. In discussing these issues, we have joined and rearranged the issues where appropriate.

As a first point, Bell states that plaintiff did not prove (i) a specific defect in the helmet, or (ii) that the specific defect caused plaintiff's injuries. To the extent relevant, the charge reads:

"Plaintiff is not required to establish a specific defect in the helmet which caused her injuries * * *

"If on all of the evidence you find that the particular helmet worn by the plaintiff violated Standard 218 and if such violation was a proximate cause of the injury to the plaintiff, then you must find that the Defendant Bell was negligent."

Bell did not except to these portions of the charge. Thus, the above excerpts constitute the law of the case. Bell was and is bound by the charge on this point as a result of its failure to except. (*Bichler v Lilly & Co.*, 55 NY2d 571, 584.)

For purposes of the retrial hereinafter ordered, we make the following comments. If the jury accepts the validity of the SWRI report, then the report may be considered as some evidence that Bell violated a minimum safety standard. The report plus all other evidence in the record should be considered by the jury in determining whether there was an actual violation of the minimum safety standards set forth in Federal Motor Vehicle Safety Standard

No. 218. At the retrial, the jury must also consider the fact that the D.O.T. has dropped the investigation in this matter. An actual violation of the minimum safety standards must necessarily translate into a specific defect in the Super Magnum model. The jury must find, of course, that the specific defect was the proximate cause of plaintiff's injuries. The foregoing comments are not intended to be restrictive. Plaintiff, if so advised, may introduce such other evidence as may show a defect and the consequences of that defect.

■ Second, it should be stressed that Bell did not object to the submission of the case upon the four theories mentioned above. Therefore, Bell has not reserved its right to contend upon appeal that the case should have only been submitted on the theory of strict products liability.

Third, Bell did take a specific exception to other portions of the charge which read as follows: "The dangerous and unusual performance of a product when put to its intended use may warrant an inference that it was defective if other likely explanations of the injuries are ruled out by a preponderance of the evidence * * * If the circumstances surrounding the happening of her injuries were of such a nature that in the ordinary course of events they would not have occurred if the helmet were not defective, then the law permits, but does not require you to infer from the happening of the injuries that the plaintiff's helmet was defective."

■ The present action is a "second collision" case as against Bell (*Bolm v Triumph Corp.*, 33 NY2d 151; *Rainbow v Elia Bldg. Co.*, 79 AD2d 287, affd 56 NY2d 550; *Caiazzo v Volkswagenwerk A.G.*, 647 F2d 241). Under the "crashworthiness" or "second collision" doctrine, plaintiff was required to prove that her injuries were more severe than they would have been had the helmet been properly designed. The jury should not have been permitted to infer that the helmet was defective from the circumstances surrounding the occurrence. As a consequence of the collision, plaintiff would have necessarily sustained some injuries. Hence, the jury could not infer that the helmet was defective from the mere fact that plaintiff was injured. Plaintiff was required to show by independent proof that a

defect in the helmet caused enhanced injuries. The error in these portions of the charge require a new trial.

While Bell did except to these portions of the charge, it failed to pursue the "second collision" doctrine in other phases of the charge. For example, Bell never requested that its damages be limited to any enhancement caused by the defect in the helmet if such defect were found. Again, by failing to except at the trial level, Bell may not raise this error on appeal.

■ As a fourth point, Bell maintains that the trial court abused its discretion in limiting the direct examination of Bell's expert, Dr. Gamache. This expert was a neurological surgeon who had treated over 1,000 trauma injuries to the brain. Bell attempted to examine Dr. Gamache with regard to the protection afforded to the plaintiff by the helmet. The trial court sustained an objection by plaintiff. Under the "second collision" doctrine, Gamache's testimony on this issue was very relevant. Bell should have been permitted to show that the helmet reduced the injuries and did not cause any enhanced injuries.

■ Fifth, error is alleged with reference to the admission of the police report. This report was inexplicably admitted during the testimony of defendant Davis. The police report indicates that a Police Officer Byrne was at the scene. The report is signed by Police Officer Betz. Neither Byrne nor Betz testified at trial. Therefore, no foundation was laid for the admission of this exhibit.

It should be stressed that this exhibit was particularly important to the resolution of the liability issues. It contained a schematic showing the point of impact to be on Spagna's side of Schley Avenue. Additionally, it indicated that Spagna's motorcycle did skid 40 feet before the impact. Based upon the schematic in the police report, plaintiff's reconstruction expert, Burrill, had made his own drawing of the event. Spagna and Bell were denied the right to test the accuracy of the police report because neither of the responding officers was present at trial. It was impossible for the defendants to test whether the accident report was based upon eyewitness observations of the officers or whether it was based upon hearsay (see, generally, *Murray v Donlan,* 77 AD2d 337).

Sixth, it is asserted that one of plaintiff's experts, Dr. Ben-Yishay, improperly testified from two reports that did not constitute business records (CPLR 4518). Dr. Ben-Yishay was a psychologist and director of a free program for rehabilitation of the brain-injured at New York University Hospital. Plaintiff had been enrolled in that program.

The first report was in the nature of a graph which showed that plaintiff's progress as a file clerk was below normal. This graph was excluded from evidence. Over objection, Dr. Ben-Yishay was permitted to interpret it for the jury. A second report indicating the plaintiff's lack of progress on the job was admitted over Bell's motion to strike.

■ Each of these reports were prepared one week before trial by an unnamed assistant of Dr. Ben-Yishay. The reports were not prepared in the regular course of business but were specifically prepared to assist Dr. Ben-Yishay with his testimony at trial. To an extent, these reports furnished evidence that was cumulative. They buttressed Dr. Ben-Yishay's prior testimony that test results had demonstrated the plaintiff was unemployable. Nonetheless, these reports and any testimony concerning the substance of these reports should have been excluded. The admission of the one report and the testimony concerning the other confirmed the severity of plaintiff's brain damage. It is very likely that the jury placed particular significance upon these reports in assessing damages.

■ Seventh, Bell avers that the trial court erroneously prevented it from cross-examining plaintiff's reconstruction expert, Burrill, concerning lacerations found on plaintiff's body after the occurrence. In reconstructing the event, Burrill had relied upon many indicia including the nature and extent of the injuries to the plaintiff. The trial court should have permitted greater latitude in cross-examination upon this subject. Nonetheless, in the context of this protracted trial, we find this error to be harmless. Bell had effectively impeached Burrill by establishing that he was unaware that both Davis and the plaintiff had testified that the plaintiff had flown through the air before

coming to rest on the grille. In this light, Burrill's testimony as to the lacerations was of minor value.

As the eighth issue, Bell asserts that its cross-examination of plaintiff's engineer, Dr. Igor Paul, was severely limited on the topic of "dwell time". Paul testified that when a helmet exceeded impact safety standards, the brain was placed in a zone of danger. The trial court, for the most part, restricted the evidence at trial to that bearing upon the minimum safety standards of D.O.T. Bell contends that it should have been allowed to show that other national safety standards did not place any significance upon the "dwell time" concept. Despite Bell's protestation in this regard, the record shows that it was able to elicit from Dr. Paul that these tests did not place the same emphasis on "dwell time". For instance, upon cross-examination, Dr. Paul admitted that the Snell Foundation had abandoned this concept before the occurrence. Bell's claim of error in this regard is not substantiated by the record.

Ninth, Bell argues that the verdict was contrary to the weight of the evidence. A verdict should be set aside only where it seems palpably wrong and it can be plainly seen that the preponderance is so great that the jury could not have reached their conclusion upon any fair interpretation of the evidence (*Kimberly-Clark Corp. v Power Auth.,* 35 AD2d 330, 335). By reason of Bell's failure to except to the charge on many critical points, the plaintiff was allowed to recover by merely showing that there was a violation of the minimum safety standards and that such violation caused the plaintiff's injuries. Under this criterion, we find that the verdict was not against the weight of the evidence.

Tenth, error is alleged with regard to the portion of the charge which permitted the jury to apply a reduced burden of proof if it found that plaintiff actually suffered a loss of memory (*Schechter v Klanfer,* 28 NY2d 228; *Noseworthy v New York,* 298 NY 76). In her testimony at her examination before trial and at trial, plaintiff did not seem to recall any of the details surrounding the occurrence except for the fact that she went flying through the air. Under this circumstance, the trial court properly allowed the jury to apply a charge under *Schechter* (*supra*).

■ Finally, Bell contends that the trial court should have granted a one-day continuance so that Bell could call a medical specialist. As the trial court observed, there was more than ample medical evidence in the record at that juncture. It cannot be said that the court abused its discretion in denying a continuance.

Accordingly, the judgment of the Supreme Court, Bronx County (Silbowitz, J.), entered October 27, 1982, awarding the plaintiff $450,988.55 against defendant Spagna, $300,665.73 against defendant Davis, and $2,255,722.11 against defendant Bell, should be reversed, on the law, and the matter should be remanded for a new trial, with costs to abide the event.

SANDLER, J. (concurring). I agree that the judgment entered in favor of the plaintiff should be reversed and a new trial ordered essentially for the reasons set forth in the court's opinion.

In particular, this result seems to me required by two erroneous rulings that cannot reasonably be dismissed as harmless. The first was the refusal of the trial court to permit Dr. Francis Gamache, the examining physician for Bell Helmet Corp. (Bell), to offer his opinion regarding the degree of protection from head injury received by plaintiff as a result of her wearing the motorcycle helmet. The second was the introduction into evidence of the police accident report without the appropriate foundation clearly required by the circumstances of this case.

I disagree, however, with the observations in the court's opinion that plaintiff was required to establish that a specific underlying defect in the helmet was the proximate cause of plaintiff's injury, and that "the jury should not have been permitted to infer the helmet was defective from the circumstances surrounding the occurrence." It seems to me, at best, unwise for this court to instruct the Trial Judge in advance of the retrial with regard to an issue that may be affected by the development of evidence at the trial. Moreover, on the facts presented in this trial, I do not believe that the law imposes upon the plaintiff the burden of establishing a specific underlying defect in the helmet.

In *Halloran v Virginia Chems.* (41 NY2d 386, 388), the Court of Appeals set forth the controlling rule of law: "The

principal issue argued by defendant Virginia Chemicals is that plaintiff failed to make out a prima facie case because no particular defect in the packaged refrigerant was ever discovered or established. That issue merits little discussion. In a products liability case it is now established that, if plaintiff has proven that the product has not performed as intended and excluded all causes of the accident not attributable to defendant, the fact finder may, even if the particular defect has not been proven, infer that the accident could only have occurred due to some defect in the product or its packaging (see *Codling v Paglia,* 32 NY2d 330, 337-338; *Fogal v Genesee Hosp.,* 41 AD2d 468, 478; see, generally, 47 NY Jur, Products Liability, §§ 14, 18)." This principle has been restated and applied with uniform consistency in a variety of different factual circumstances. (See, e.g., *Caprara v Chrysler Corp.,* 52 NY2d 114, 123; *McDermott v City of New York,* 50 NY2d 211, 220-221; *Titlebaum v Loblaws, Inc.,* 64 AD2d 822.)

In *Halloran (supra)* the rule was formulated in terms of the situation there presented, which is the usual one, in which the plaintiff claimed that the accident itself would not have occurred if the product had performed as intended, and that the circumstances justified the conclusion that the product was defective at the time of manufacture. In this case, which falls within the so-called "second collision" category of cases (*Bolm v Triumph Corp.,* 33 NY2d 151), it is plaintiff's claim that she sustained more severe injuries than would otherwise have occurred if the helmet had performed as intended; that the helmet was labeled "D.O.T.", a clear representation by the manufacturer to any purchaser or user that the helmet would meet or exceed the safety standards promulgated by the Department of Transportation; and that the helmet did not in fact perform in accordance with those standards.

Upon analysis, the rule set forth in *Halloran (supra)* is simply an application to product liability cases of the familiar principle that a legally significant fact may be established by circumstantial evidence. The fact that an accident occurred for reasons independent of the allegedly defective product is an additional element, and one that may have legal significance in certain situations. But I see

no basis for the court's implicit conclusion that the principle is automatically inapplicable to "second collision" cases.

The test should be whether the evidence is sufficient to establish circumstances from which a jury could reasonably infer that the plaintiff sustained more severe injuries than would have occurred if the product performed as intended, that the product was therefore defective, and that the defect existed at the time of the manufacture and sale.

The evidence adduced by the plaintiff in this case was sufficient to present a factual question for the jury, wholly without regard to proof of a specific defect. Any doubt as to the legal sufficiency of plaintiff's case was surely dispelled by the significant testimony elicited on cross-examination from Bell's expert. He testified that the helmet liner, intended to be a "second line of defense", was designed to perform that function by collapsing on a significant impact; that the helmet in this case disclosed minimal signs of collapse; and that the limited character of the liner collapse indicated either that the liner did not perform its intended function or that the impact "was not severe enough".

Under either alternative a case legally sufficient to submit the issue of liability to the jury was made out. If the impact was an extremely severe one, which was Bell's basic thesis at the trial, the failure of the liner to collapse would establish that the product did not perform as it was intended to perform in a respect directly relevant to the injuries sustained by the plaintiff. If the impact was not severe enough to collapse the liner, the question is immediately presented as to how the plaintiff could have sustained the brain injuries that she sustained if the helmet had performed as it was designed to perform.

A remaining question is presented by the application to the facts here of the part of the rule that requires the evidence to exclude all causes of the accident not attributable to the defendant. As applied in the decisions, it appears that this aspect of the rule was addressed to the situation in which the product may have been subject to such misuse after it was sold that its failure to perform as

intended could not fairly be attributed to a defect at the time of its manufacture. (See, e.g., *Shelden v Hample Equip. Co.,* 89 AD2d 766, affd 59 NY2d 618; *Fox v Corning Glass Works,* 81 AD2d 826.)

In this case no direct evidence was presented by the plaintiff to exclude that possibility, plaintiff's brain injury having severely impaired her memory. However, Bell's experts had an opportunity to examine the helmet and it seems reasonable to infer from the absence of any evidence adduced by Bell on the point that they detected no indications of misuse prior to the accident that would account for the manner in which it then performed. Under the circumstances, considering the nature of the product and plaintiff's loss of memory as a result of the accident, the evidence presented at the trial seems to me to have been sufficient to permit a jury to have concluded that the performance of the helmet at the time of the accident could not reasonably be attributed to some misuse of it between the day of the sale and the accident.

KUPFERMAN and ALEXANDER, JJ., concur with MURPHY, P. J.; SANDLER and MILONAS, JJ., concur in a separate opinion by SANDLER, J.

Judgment, Supreme Court, Bronx County, entered on October 27, 1982, reversed, on the law, the judgment vacated and the matter remanded for a new trial with $75 costs and disbursements of this appeal to abide the event.